UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
THE GERFFERT COMPANY, INC., et al.,

      Plaintiffs,    **MEMORANDUM &**
                **O R D E R**
  - against -
                09 CV 266 (KAM)
JAMES DEAN, et al.,

      Defendant.
-----------------------------------------------------------X

  On January 22, 2009, plaintiffs The Gerffert Company, Inc. ("Gerffert") and Stephen Panigel filed this action against defendants James Dean, Dolores King, William J. Hirten Co. LLC, HMH Religious Manufacturing Co., Inc., Andrea Bonella, Mario Bonella, Gianfranco Bonella, Fratelli Bonella, s.r.l., and "John Doe" and "Jane Doe," d/b/a Fratelli Bonella, s.r.l. ("Fratelli Bonella"), seeking damages based on defendants' alleged breach of an agreement granting Gerffert the exclusive right to market and distribute the "Bonella Line" of religious artwork in the United States.

  Presently before this Court is a motion to disqualify plaintiffs' counsel, Mark Horowitz, Esq., and Joseph E. Magnotti, Esq., based on an alleged conflict of interest. On November 10, 2010, the parties consented to the jurisdiction of the undersigned to decide the motion to disqualify only.

  For the reasons set forth below, the Court grants defendants' motion for disqualification as to Mr. Horowitz and as to Mr. Magnotti.

## FACTUAL BACKGROUND

  In connection with the motion, both sides have submitted affidavits setting forth what each contends are the salient facts in this dispute.

  Andrea Bonella, a named defendant and employee of Fratelli Bonella, represents that Mark Horowitz, a New York attorney, began representing Fratelli Bonella and members of the

Bonella family (collectively, the "Bonellas"), as early as March 2003, continuing up to December 2008. (Bonella Decl.[1] ¶ 3). According to Mr. Bonella, Mr. Horowitz "handled virtually all of Bonellas' legal affairs in the United States for at least three years" (id. ¶ 5), including: 1) the Bonellas' relationship with plaintiffs; 2) the Fratelli Bonella litigation against Quadriga Art LLC and the impact of Mr. Panigel's potential testimony in that litigation; 3) issues relating to intellectual property management and protection; 4) contractual matters relating to the sale of Bonella merchandise; and 5) the selection of other attorneys retained by Fratelli Bonella. (Id. ¶ 4). Mr. Bonella asserts that during the time of Mr. Horowitz's representation, people associated with Fratelli Bonella "shared a great deal of confidential information" with Mr. Horowitz. (Id. ¶ 5).

According to Mr. Bonella, in October 2007, Fratelli Bonella agreed in principle to purchase certain of Gerffert's assets and Gerffert, who had been represented by Mr. Horowitz as well, wanted Mr. Horowitz to represent Gerffert in the negotiations and transaction. (Id. ¶¶ 6, 7). At that time, Mr. Horowitz prepared a conflict waiver for Andrea Bonella's signature on behalf of Fratelli Bonella. (Id. ¶ 8, Ex. D). The waiver only extended to certain matters where Gerffert and Panigel might be potentially adverse to the Bonellas' interests, including:

> (i) sale of certain assets of Gerffert to Fratelli Bonella. . .;
> (ii) establishment of an ongoing relationship of Mr. Panigel with Fratelli Bonella. . . ; (iii) negotiation of an agreement between Mr. Panigel and Fratelli Bonella s.r.l. regarding Mr. Panigel's participation in the Quadriga Art litigation; and
> (iv) the transactions and agreements related to all the foregoing.

(Bonella Decl., Ex. D). The waiver did not extend to any other instances where the interests of Gerffert or Panigel were adverse to those of the Bonellas; indeed, the conflict waiver explicitly stated that Horowitz would not represent either party in the event that a dispute arose between them. The waiver stated:

> I [Horowitz] confirm that in the event that a dispute

---

[1] Citations to "Bonella Decl." refer to the Declaration of Andrea Bonella in Support of Defendants' Motion to Disqualify Plaintiffs' Counsel, dated November 1, 2010.

>should arise between or among any of Mr. Panigel,
>Gerffert and Fratelli Bonella, s. r. l., I will not represent
>any party in any litigation arising therefrom.

(Id.) Mr. Horowitz also agreed in the conflict waiver that he would not disclose the "non-public or proprietary information that [he] learned or may learn in connection with [his] representation of Fratelli Bonella, s.r.l.." (Id.) According to Mr. Bonella's Declaration, neither he or anyone associated with Fratelli Bonella ever agreed or authorized Mr. Horowitz to represent Mr. Panigel and/or Gerffert in the instant litigation. (Bonella Decl. ¶ 11).

In response to the motion for disqualification, plaintiffs have submitted the Declarations of Mr. Horowitz and Stephen Panigel, Gerffert's principal. According to Mr. Horowitz, he first represented Gerffert in connection with a real estate transaction in 1981 and thereafter continuously represented Gerffert and Panigel since 1985. (Horowitz Decl.[2] ¶¶ 3-4; see also Panigel Decl.[3] ¶ 2 (explaining that Mr. Horowitz has "continuously represented Gerffert and me since 1985")). According to Mr. Horowitz, he first represented Fratelli Bonella in 1985 when the company was a co-plaintiff with Gerffert in a copyright infringement and unfair competition action. (Horowitz Decl. ¶ 5). He states that he received all of his information in connection with that litigation, including exhibits, from Mr. Panigel, who dealt with Mario Bonella. (Id.) According to Mr. Horowitz, he also jointly represented Fratelli Bonella and Gerffert in an infringement action in 1987, which was settled, and he states that again he received all of his information from Mr. Panigel. (Id. ¶ 6).

Mr. Horowitz represents that from time to time, he wrote cease and desist letters on behalf of Fratelli Bonella to various small infringers who, in most instances, complied after a reasonable period of time. (Horowitz Decl. ¶ 7). Again, he claims that he received all the necessary information, including copyright registration certificates and copies of images, from

---

[2] Citations to "Horowitz Decl." refer to the Declaration of Mark Horowitz in Opposition to Defendants' Motion to Disqualify Plaintiff's Counsel, dated November 15, 2010.

[3] Citations to "Panigel Decl." refer to the Declaration of Stephen Panigel in Opposition to the Defendants' Motion to Disqualify Plaintiffs' Counsel, dated November 12, 2010.

3

Mr. Panigel. (Id.) Mr. Panigel confirms that there have been occasions when Mr. Horowitz represented both Bonella and Gerffert, but, according to Panigel, Horowitz "never met with the Bonellas outside of [his] presence" and "never received confidential information or documents from the Bonellas."[4] (Panigel Decl. ¶ 3).

With respect to Quadriga Art, formally Reproducta, Inc., Mr. Horowitz explains that in 1960, Reproducta entered into an agreement with Fratelli Bonella, giving Reproducta the right to reproduce and sell Fratelli Bonella images for certain purposes such as religious fundraising. (Id. ¶ 8). The more traditional retail market was reserved for Fratelli Bonella, which distributed its products in the United States through Gerffert. (Id.) In 1993, Mr. Panigel supplied a copy of the agreement between Reproducta and Fratelli Bonella to Mr. Horowitz and asked him to review it. (Id. ¶ 10).

According to Mr. Horowitz, Reproducta began to encroach on Fratelli Bonella's and Gerffert's business by licensing the Bonella images to Gerffert competitors. (Id. ¶¶ 11-12). In 1995, at Mr. Panigel's request, Mr. Horowitz drafted a complaint on behalf of Fratelli Bonella and Gerffert against Reproducta, Quadriga, Regina Press, and Autom, Inc., which used Bonella images to manufacture competing retail items. (Id. ¶ 13). Eventually, Fratelli Bonella retained the law firm of Darby and Darby to prosecute the action only against Autom, dropping co-plaintiff Gerffert and the other defendants. (Id. ¶ 14). Mr. Horowitz was not involved in that litigation and claims to have never received any correspondence from the other attorneys. (Id.)

In 1999, Quadriga licensed Regina Press to reproduce Bonella images in competition with Gerffert. (Id. ¶ 15). Another firm represented Fratelli Bonella in that case and, according to Mr. Horowitz, Gerffert and Fratelli Bonella shared equally in paying the attorneys' fees. (Id.) Indeed, according to Panigel, Gerffert signed a joint retainer agreement with Sonnenschein Nath & Rosenthal LLP ("the Sonnenschein firm"), and Gerffert paid fifty percent of the legal fees in connection with that litigation. (Id.) Mr. Horowitz, however, was not involved in that litigation

---

[4]See discussion infra at 12-13.

until the summer of 2004, when Mr. Panigel sent Horowitz a draft settlement agreement, which both believed was a terrible deal for Fratelli Bonella. (Id. ¶ 18). According to Mr. Horowitz, he and Panigel prepared a revised draft settlement agreement at the request of Andrea and Mario Bonella, but it was rejected by Quadriga's lawyers. (Id. ¶¶ 19-20). Thereafter, at the urging of Panigel and Horowitz, the Bonellas replaced their original attorneys and retained the Sonnenschein firm, signing a retainer agreement in January 2005, which was also signed by Panigel on behalf of Gerffert. (Id. ¶ 20). Horowitz thereafter acted as "contact person" for Panigel and Fratelli Bonella. (Id. ¶ 21).

In October 2007, Horowitz and Panigel attempted unsuccessfully to negotiate a potential sale of Gerffert or its assets to Fratelli Bonella. (Id. ¶ 22). It was during the course of these discussions that Mr. Horowitz executed the conflict waiver with respect to his continuing representation of Fratelli Bonella. (Id. ¶ 23). Although the waiver references any proprietary or confidential information that Mr. Horowitz has "learned or may learn" by reason of representing Fratelli Bonella in matters other than the matters specifically referenced in the waiver letter, according to Mr. Horowitz, he has never received any proprietary or confidential information from the Bonellas or Fratelli Bonella. (Id.) Moreover, according to Mr. Horowitz, as of December 1, 2008, after the Quadriga matter settled, he "had no pending matters on which he represented the Bonellas, nor did he perform any services on their behalf thereafter." (Id. ¶ 28)

On January 22, 2009, plaintiffs, by their counsel of record, Joseph Magnotti, commenced this lawsuit against Fratelli Bonella and members of the Bonella family.[5] Almost two years into the lawsuit, Mr. Horowitz filed a Notice of Appearance on behalf of Gerffert and Stephen Panigel on October 12, 2010. Thereafter, defendants brought the instant motion, seeking to disqualify Mr. Horowitz, arguing two grounds: 1) under the "per se" rule, his simultaneous

---

[5]The Complaint also names James Dean, Dolores King, William J. Hirten Co., and HMH Religious Manufacturing Co. William J. Hirten Co., who is represented by the Bonella defendants' counsel, joins in the motion to disqualify plaintiffs' counsel but has provided no new or additional substantive arguments in support of disqualification apart from the arguments advanced by the Bonella defendants.

and/or concurrent representation of Fratelli Bonella and plaintiffs requires disqualification; and 2) because there is a substantial relationship between Horowitz's former representation of the Bonellas during which he had access to relevant privileged information of the defendants that may relate to the current litigation, his disqualification is also mandated by the "substantial relationship" test.

In response, plaintiffs contend that the "per se" rule does not apply because Fratelli Bonella ceased to be a client of Horowitz's in December 2008. With respect to the "substantial relationship" test, plaintiffs contend that Mr. Horowitz never received any confidential information directly from Fratelli Bonella or the Bonellas; any relevant information was received directly from Mr. Panigel.

## DISCUSSION

A. Standards

It is well established that the Court's authority to disqualify an attorney stems from its general supervisory power over the attorneys appearing before it, see Handelman v. Weiss, 368 F. Supp. 258, 263 (S.D.N.Y. 1973); see also United States v. Miller, 624 F.2d 1198, 1201 (3d Cir. 1980), and the determination of disqualification is discretionary in nature. Hull v. Celanese Corp., 513 F.2d 568, 571 (2d Cir. 1975); see also Laker Airways Ltd. v. Pan Am. World Airways, 103 F.R.D. 22, 27 n.4 (D.D.C. 1984). There is a longstanding rule that,

> [w]hen dealing with ethical principles, . . . we cannot paint with broad strokes. The lines are fine and must be so marked. Guideposts can be established when virgin ground is being explored, and the conclusion in a particular case can be reached only after painstaking analysis of the facts and precise application of precedent.

Fund of Funds, Ltd. v. Arthur Andersen & Co., 567 F.2d 225, 227 (2d Cir. 1977) (quoting United States v. Standard Oil Co., 136 F. Supp. 345, 367 (S.D.N.Y. 1955)). Indeed, as the court in Fund of Funds, Ltd. noted, "in deciding questions of professional ethics men of good will often differ in their conclusions." Id. Recognizing this, the Second Circuit has held that the district court's finding will only be overturned upon a showing of abuse of that discretion. Bobal v. Rensselaer

Polytechnic Inst., 916 F. 2d 759, 764 (2d Cir. 1990) (citing Hull v. Celanese Corp., 513 F.2d at 571), cert. denied, 499 U.S. 943 (1991).

In considering defendants' argument that the plaintiffs' attorneys should be disqualified, this Court is mindful of its responsibility to "preserve a balance, delicate though it may be, between an individual's right to his own freely chosen counsel and the need to maintain the highest ethical standards of professional responsibility." Emle Indus., Inc. v. Patentex, Inc., 478 F.2d 562, 564-65 (2d Cir. 1973); accord General Motors Corp. v. City of N.Y., 501 F.2d 639, 649 (2d Cir. 1974); see also GSI Comm. Solutions, Inc. v. BabyCenter, LLC, 618 F.3d 204, 209 (2d Cir. 2010); Nordwind v. Rowland, 584 F.3d 420, 435 (2d Cir. 2010); Fund of Funds Ltd. v. Arthur Andersen & Co., 567 F.2d at 237 (noting that "above all else, we must maintain public trust in the integrity of the Bar"). The Court is also mindful of its responsibility to supervise the members of its bar, see id., and recognizes the admonition of the Second Circuit that "any doubt is to be resolved in favor of disqualification." Hull v. Celanese Corp., 513 F.2d at 571; see also Baird v. Hilton Hotel Corp., 771 F. Supp. 24, 27 (E.D.N.Y. 1991) (holding that "'if there were any doubt as to the propriety of our action, we would resolve it in favor of disqualification'") (quoting Cheng v. GAF Corp., 631 F.2d 1052, 1059 (2d Cir. 1980), judgment vacated on other grounds, 450 U.S. 903 (1981)).

The disqualification of an attorney upon the motion of opposing counsel is a serious sanction that ought not be imposed lightly. It is well-established that courts in the Second Circuit approach motions for disqualification with "fairly strict scrutiny" and that they are generally disfavored. See Murray v. Metropolitan Life Ins. Co., 583 F.3d 173, 178 (2d Cir. 2009); Lamborn v. Dittmer, 873 F.2d 522, 531 (2d Cir. 1989); accord Ragdoll Prods. (UK) Ltd. v. Wal-Mart Stores, Inc., No. 99 CV 2101, 1999 WL 760209, at *1 (S.D.N.Y. Sept. 27, 1999) (holding that motions to disqualify are "subject to strict scrutiny"); see also Stratavest Ltd. v. Rogers, 903 F. Supp. 663, 666 (S.D.N.Y. 1995) (noting that "[m]otions to disqualify opposing counsel are viewed with disfavor in this Circuit"); United States Football League v. Nat'l Football League,

605 F. Supp. 1448, 1452 (S.D.N.Y. 1985) (holding same).

Indeed, courts have become increasingly "skeptical of motions to disqualify counsel, and they now approach them with cautious scrutiny." Laker Airways Ltd. v. Pan American World Airways Ltd., 103 F.R.D. at 28. See also Murray v. Metropolitan Life Ins. Co., 583 F.3d at 178; Bennett Silvershein Assocs. v. Furman, 776 F. Supp. 800, 802 (S.D.N.Y. 1991) (noting that "[m]otions to disqualify opposing counsel are viewed with disfavor in this Circuit because they are 'often interposed for tactical reasons'") (citing United States Football League v. Nat'l Football League, 605 F. Supp. at 1452 (collecting cases)); Laker Airways Ltd. v. Pan American World Airways, 103 F.R.D. at 28 (noting that "[d]isqualification motions have become increasingly popular tools of the litigation process, being used . . . for purely strategic purposes") (internal quotations omitted). At least one court has commented that "[d]isqualification motions are subject to abuse for tactical purposes," often resulting in "complex satellite litigation extraneous to the case." Universal City Studios, Inc. v. Reimerdes, 98 F. Supp. 2d 449, 455 (S.D.N.Y. 2000); see also Evans v. Artek Sys. Corp., 715 F.2d 788, 790 (2d Cir. 1983) (noting that "'even when made in the best of faith, such motions inevitably cause delay'") (quoting Board of Educ. v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979)).

Moreover, because disqualification deprives a client of its choice of counsel, the Second Circuit has cautioned courts that disqualification of an attorney is only appropriate where there has been a clear violation of the Rules of Professional Conduct that leads to a "significant risk of trial taint," Glueck v. Jonathan Logan, Inc., 653 F.2d 746, 748 (2d Cir. 1981), such as when "the attorney is in a position to use privileged information acquired in the representation of a client against that client in another matter," Universal City Studios, Inc. v. Reimerdes, 98 F. Supp. 2d at 455, or when "there is a significant risk that [a conflict of interest] will affect the attorney's ability to represent his or her client with vigor." Id.; see also Mitchell v. Metro. Life Ins. Co., Inc., No. 01 CV 2112, 2002 WL 441194, at *4 (E.D.N.Y. Mar. 21, 2002) (noting that "relief will be granted only when the facts concerning the lawyer's conduct pose[ ] a significant risk of trial

8

taint").

Attorneys arguing before this Court must abide by the recently implemented New York State Rules of Professional Conduct (the "Rules"), 22 N.Y.C.R.R. § 1200, which replaced the old Canons and Disciplinary Rules that were formerly in place in the State of New York. See E.D.N.Y. Local Rule 1.3. The New York Rules of Professional Conduct were revised and implemented on April 1, 2009. To interpret the Rules, this Court may look to decisions of the New York State courts. E.D.N.Y. Local Rule 1.5(b)(5). Rule 1.7 states as follows:

> [A] lawyer shall not represent a client if a reasonable lawyer would conclude that either: (1) the representation will involve the lawyer in representing differing interests; or (2) there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests.

N.Y. R. Prof'l Conduct 1.7(a), 22 N.Y.C. R.R. § 1200.

Under the former Canons and Disciplinary Rules, courts considering an alleged conflict distinguished between situations involving concurrent and successive representation. See, e.g., Hempstead Video, Inc. v. Incorporated Village of Valley Stream, 409 F.3d 127, 133 (2d Cir. 2005) (holding that "[t]he standard for disqualification varies depending on whether the representation is concurrent or successive"). If the representation was concurrent, it was considered "'prima facie improper' for an attorney to simultaneously represent a client and another party with interests directly adverse to that client." Id. (quoting Cinema 5, Ltd. v. Cinerama, Inc., 528 F.2d 1384, 1387 (2d Cir. 1976)). In such instances, the attorney with an apparent conflict of interest must be disqualified unless he can demonstrate "at the very least, that there will be no actual or apparent conflict in loyalties or diminution in the vigor of his representation." Id. (quoting Cinema 5, 528 F.2d at 1387). Even though the Canons have been replaced by the New York Rules of Professional Conduct, the new rules still incorporate much of the substance of the old rules. See Mercado v. City of New York, No. 08 CV 2855, 2010 WL 3910594, at *7 (S.D.N.Y. Sept. 30, 2010); Merck Eprova AG v. ProThera, Inc., No. 08 CV 0035,

2009 WL 4067209, at *11, n.1 (S.D.N.Y. Sept. 17, 2009). Therefore, much of the precedent interpreting the old rules still remains applicable. Under both the new Rules and the Canons, it is clear that all attorneys owe a duty of undivided loyalty to the clients which have hired them. Cinema 5, Ltd. v. Cinerama, Inc., 528 F.2d at 1386. Clients have a right to expect that their lawyers will not accept money from other parties to act in a manner that is adverse to their interests. Id.

These rules are not the only source of authority for the court's power to disqualify attorneys. "In a technical sense the only truly binding authority on disqualification issues is [Second] Circuit precedent, because our authority to disqualify an attorney stems from the Court's inherent supervisory authority." Med. Diagnostic Imaging, PLLC v. CareCore Nat., LLC, 542 F. Supp. 2d 296, 305 (S.D.N.Y. 2008).

B. Analysis

The "per se rule" applies when an attorney "simultaneously represents clients with differing interests" even though the representation ceases prior to the disqualification motion. Erick v. Binghamton City Sch. Dist., 210 F.R.D. 17, 26 (N.D.N.Y. 2002). The Second Circuit has already opined that "we think it would be questionable conduct for an attorney to participate in any lawsuit against his own client without the knowledge and consent of all concerned." Cinema 5, Ltd. v. Cinerama, Inc., 528 F.2d at 1386. In the case of concurrent representation of two clients, suing one client on behalf of the other is "prima facie improper." Id. at 1387. Moreover, an attorney or firm may not transform the relationship by abandoning one client in order to avoid the application of the more stringent per se test. See Fund of Funds Ltd. v. Arthur Andersen & Co., 435 F. Supp. 84, 99 (S.D.N.Y.), aff'd in part, rev'd in part on other grounds, 567 F.2d 225 (2d Cir. 1977). The presumption in favor of disqualification in this type of situation may be rebutted if the attorney can show that "there will be no actual or apparent conflict in loyalties or diminution in the vigor of his representation." Id.

10

Thus, the first question is whether or not the Bonellas should be considered a current client of Mr. Horowitz. Courts in New York employ a six-factor test to decide whether an attorney-client relationship exists, though no one factor is dispositive. Merck Eprova AG v. ProThera, Inc., 2009 WL 4067209, at *8. The factors include:

> 1) whether a fee arrangement was entered into or a fee paid;
> 2) whether a written contract or retainer agreement exists indicating that the attorney accepted representation; 3) whether there was an informal relationship whereby the attorney performed legal services gratuitously; 4) whether the attorney actually represented the individual in one aspect of the matter (e.g., at a deposition); 5) whether the attorney excluded the individual from some aspect of [the] litigation in order to protect another (or a) client's interest; 6) whether the purported client believes that the attorney was representing him and whether this belief is reasonable.

Id.

Here, it is undisputed that Mr. Horowitz represented both Gerffert and the Bonella defendants beginning in 2003. Although plaintiffs contend that Mr. Horowitz has been in-house counsel for Gerffert for over 20 years (Magnotti Let.[6] at 7), he has also held himself out to be counsel to the Bonellas. In a letter dated March 18, 2003, which he sent to Barton Cotton, a seller of religious artifacts, Mr. Horowitz stated: "Gentlemen, I am the attorney for Fratelli Bonella, S.r.l., of Milan, Italy." (Bonella Decl., Ex. A). Even Mr. Horowitz concedes that he represented the Bonellas in connection with a variety of matters over the years, sending out cease and desist letters to various infringers and becoming involved in certain litigation during the period. Indeed, even as late as December 2008, he was submitting invoices to the Bonellas for their payment for his services. There is no question that the Bonellas believed that Mr. Horowitz was representing them during this period and that belief was certainly reasonable under the circumstances, particularly in light of the undisputed fact that he submitted invoices and received payment from the Bonellas for his services.

---

[6] Citations to "Magnotti Let." refer to the letter filed by Joseph Magnotti, Esq. on June 14, 2010.

Mr. Horowitz, however, takes the position that his representation of the Bonellas ceased as of December 1, 2008, prior to the filing of this lawsuit. The Bonella defendants dispute this contention and argue that the per se rule applies because Horowitz's representation has never formally ceased; Fratelli Bonella has never received a cessation of service communication from Horowitz, and it was still receiving invoices for his services as of December 2008, after the instant conflict arose. Specifically, the defendants contend that the conflict between Bonella and Gerffert arose in November 2008, at which time Gerffert confirmed that it had retained counsel and indicated its intention to file a lawsuit. (Dean Decl., Ex. B). Indeed, Horowitz concedes that he sent an invoice on December 1, 2008, seeking payment for services rendered but he contends that once the Quadriga matter settled, he had no pending matters in which he represented the Bonellas. (Horowitz Decl. ¶¶ 27-28). In fact, he claims that he sent a letter relating to the dispute, dated December 10, 2008, indicating that he was "willing to offer you my legal guidance and if I can be of any help in finding a solution to this problem between you and Stephen [Panigel], I would be very happy to do so." (Bonella Decl., Ex. D). This communication constitutes an acknowledgment on Mr. Horowitz's part that there was a need for a new conflict waiver; in the letter, he noted: "the letters that you and Steve [Panigel] signed last year do not cover the present situation." (Id.)

In responding to defendants' motion, plaintiffs largely ignore the per se rule, spending the majority of their submission arguing that Horowitz never received any confidential information from the defendants. In essence, Mr. Horowitz asserts that he has not "received any documentation or information from the Bonellas which is proprietary, confidential, or privileged" as a result of his alleged representation of defendants.[7] (Horowitz Decl. ¶ 29). He further claims that his communications with defendants were not subject to the attorney-client privilege, and since he terminated his relationship with them, defendants cannot be deemed to be his clients.

---

[7] The defendants disagree and argue strenuously that Mr. Horowitz has obtained significant privileged and confidential information during the course of his representation. (See Bonella Decl. ¶ 5).

12

(Id. ¶¶ 28-29).

Regardless of whether defendants did impart any confidential information to Mr. Horowitz in connection with his representation of Fratelli Bonella over the years,[8] the rules concerning disqualification apply even when no client confidences have been shared because the rules serve additional purposes. "First, the rule forbidding the representation of one client against another encourages clients to be completely honest and open with their attorneys." Pierce & Weiss, LLP v. Subrogation Partners LLC, 701 F. Supp. 2d 245, 252 (E.D.N.Y. 2010) (citing Schairer v. Schairer 192 Misc. 2d 155, 158, 745 N.Y.S.2d 410, 413 (N.Y. Sup. Ct. 2002)); see also Tekni-Plex, Inc. v. Meyner & Landis, 89 N.Y.2d 123, 131, 651 N.Y.S.2d 954, 958, 674 N.E.2d 663, 667 (N.Y. 1996). Secondly, the rules on disqualification are in place to avoid even the "appearance" of representing conflicting interests. Id. at 253. Thus, although no actual conflict may exist, the appearance of a conflict can still undermine faith in the judicial system and its fairness.

Indeed, in this case, the appearance of a conflict is substantiated by the existence of the specific conflict waiver that the parties entered into in 2007. Nowhere in the papers do plaintiffs address in any substantive way the representation made by Horowitz in the 2007 conflict waiver which clearly states: "I confirm that in the event that a dispute should arise between or among any of Mr. Panigel, Gerffert, and Fratelli Bonella, s.r.l., *I will not represent any party* in any litigation arising therefrom." (Bonella Decl. ¶ 8 (emphasis added)). There are no qualifying statements that would relieve Mr. Horowitz of his obligation under this clause; there is nothing that says that if he no longer represents the Bonellas "in any pending matters" that he is relieved from his obligation under the waiver. There is also no time limit mentioned in the letter. Indeed,

---

[8] Although Mr. Horowitz in his Declaration refutes point by point each of the examples of privileged communications provided by defendants, the Court declines to hold a hearing to determine the respective credibility of each side's representations with respect to the communications between counsel and his clients. To do so would result in the type of "complex satellite litigation extraneous to the case" decried by the court in the Universal City Studios case, and, in this case, is wholly unnecessary given the parties' express agreement as to Mr. Horowitz's role in the litigation going forward. (See discussion infra at 13-14).

13

the waiver language is arguably even more stringent than the per se rule because there appears to be no exception to it whatsoever.

The waiver represents a recognition by all parties that while their interests were aligned and not adversarial, Mr. Horowitz could continue to represent both Gerffert and the Bonellas. However, the language of the waiver is clear: both parties recognized that it would be inappropriate for Mr. Horowitz to represent either of his clients in the event that they became adversaries. Whether there was an understanding that Mr. Horowitz was in possession of confidential proprietary or privileged information or whether there was a desire of both parties to utilize one attorney as a cost-saving matter of efficiency, the parties and counsel recognized the inherent conflict that would arise in an adversarial situation.

Given the absence of any expressed cessation of the representation and the fact that even after problems arose between Gerffert and the Bonellas, Horowitz was submitting invoices to defendants and offering to mediate between the two sides, but only under a revised conflict waiver, the Court finds that there was concurrency of representation and, based on the agreement between the parties, concludes that Mr. Horowitz's disqualification is warranted.

### C. Disqualification of Mr. Magnotti

Defendants also seek to disqualify Mr. Magnotti from further representation of plaintiffs, arguing that even though Mr. Magnotti never represented the Bonellas, he should also be disqualified on the theory that Mr. Horowitz has shared confidential information with him.

Based on the record before this Court, it appears that Mr. Horowitz has been involved in this case behind the scenes long before he filed a formal Notice of Appearance on October 12, 2010. Defendants assert that "[b]y their own admission, Mr. Horowitz worked with Mr. Magnotti on this very case for at least eighteen months, without ever notifying the Bonella

14

entities or their counsel of Mr. Horowitz's participation." (Mot.[9] at 15). Although defendants provide no citation for this statement, it appears from plaintiffs' own submissions that Mr. Horowitz has been actively working on this case since June 2010, at least four months before he filed a Notice of Appearance. Specifically, in a letter filed with the Court on June 14, 2010, Mr. Magnotti informed the Court that "Mark Horowitz, Esq. . . . is Gerffert's in-house counsel, and has been for over 20 years. He is an integral part of the Gerffert team. He will continue to assist in this case." (Magnotti Let. at 7).

In support of their motion to disqualify, defendants cite a number of cases regarding the disqualification of entire firms when one lawyer is disqualified. Thus, where two attorneys are members of the same firm, courts have held that: "an attorney's conflicts are ordinarily imputed to his firm based on the presumption that 'associated' attorneys share client confidences." Hempstead Video, Inc. v. Incorporated Village of Valley Stream, 409 F.3d at 133. There is a presumption that if one attorney is conflicted, then the entire firm is conflicted; this presumption may, however, be rebutted if a protective screen is in place or the conflicted attorney is only partially associated with the firm (i.e. has "of counsel" status). Id. Courts in this circuit are particularly wary of the risk that a small number of lawyers working together may, intentionally or otherwise, share information that should be confidential. See Cheng v. GAF Corp., 651 F.2d 1052, 1058 (2d Cir. 1980) (noting that, among members of a relatively small firm, there was "a continuing danger that [the conflicted attorney] may unintentionally transmit information he gained through his prior association . . . during his day-to-day contact").

In Crudele v. N.Y.C. Police Dep't, No. 97 CV 6687, 2001 WL 1033539 (S.D.N.Y. Sept. 7, 2001), the district court disqualified the firm representing plaintiffs because a new member of the firm had previously represented defendants on a similar matter. The court decided to disqualify the firm even though the firm took numerous precautions, including prohibiting the

---

[9]Citations to "Mot." refer to the Motion to Disqualify Plaintiffs' Counsel, filed on November 1, 2010.

conflicted attorney from "speak[ing] about or have any dealings with" the case against his former client and denying the conflicted attorney access to any physical and electronic files for those cases. Id. at *2. The court looked to the American Bar Association Code of Professional Responsibility for guidance and found that there is a presumption "that client confidences are shared among the attorneys within a law firm–whether advertently or inadvertently . . . ." Id. at *3. That presumption, the court noted, "is only rebutted if (1) the attorney is effectively screened . . . and (2) there is no further appearance of impropriety." Id. In the context of a small firm, "courts are concerned that the disqualified attorney, in his day-to-day contact with his new associates, may unintentionally transmit information learned in the course of the prior representation." Id. at *4.

Here, on the one hand, it does not appear that Horowitz and Magnotti are members of a firm; they are simply co-counsel on the case. However, while they are not members of an actual law firm, their working relationship approximates the relationship of members of a firm. Moreover, neither Mr. Horowitz nor Mr. Magnotti have represented that any screen is currently in place that would prevent the exchange of confidential information. Indeed, there have been no allegations of *any* screen being erected. In fact, plaintiffs freely concede that Mr. Horowitz has been actively involved in the representation of plaintiffs and "assist[ing]" Mr. Magnotti in this case at least since June 2010. Given Mr. Horowitz's position as Gerffert's in-house counsel, it is reasonable to assume that his involvement with this case dates to its inception. Thus, even if, in response to Mr. Horowitz's disqualification, Mr. Magnotti were to cut off all communication with Mr. Horowitz, the risk that confidential information had already passed between them would remain and taint the fairness of the proceedings.

Plaintiffs' only argument appears to be that because Mr. Horowitz never received any confidential information and therefore could not have passed it on to Magnotti, there is no basis to disqualify Magnotti. As noted above, Mr. Horowitz denies that he has ever received any confidential information from the Bonellas. (See Horowitz Decl. ¶ 29). However, the entire

16

premise underlying the 2007 conflict waiver indicates that both sides considered the potential for acquiring privileged information and entered into an agreement designed to prevent Horowitz from using any such information in an adversarial proceeding between his two clients. Even if the Court were to accept as true the exceedingly unlikely scenario that no privileged information was exchanged, the appearance of impropriety remains overwhelming. Mr. Horowitz willfully violated his agreement in the conflict waiver not to represent one party in litigation against the other. To make matters worse, he and Mr. Magnotti failed to disclose Mr. Horowitz's involvement in the case until months into the litigation. It was not until June 2010 that Mr. Magnotti disclosed to the Court and to his adversaries that Mr. Horowitz had been participating in this case in contravention of the conflict waiver. It would not be unreasonable to infer from the circumstances that Mr. Horowitz and/or Mr. Magnotti sought to avoid disclosing Mr. Horowitz's involvement until disclosure was unavoidable.[10]

Given the possibility that defendants' confidential information has been shared by Mr. Horowitz with Mr. Magnotti, as well as the overwhelming appearance of impropriety, the Court finds that Mr. Magnotti should also be disqualified from representing plaintiffs in this matter. While the consequences may appear harsh under the circumstances, had plaintiff informed defendants of their intention to consult Mr. Horowitz at an earlier stage of the litigation, these problems may have been avoided.

## CONCLUSION

Based on the foregoing, the Court concludes that Mr. Horowitz has a conflict of interest that disqualifies him from representing plaintiffs in this case and grants defendants' motion. The

---

[10] On June 28, 2010, three weeks after Mr. Magnotti disclosed the fact that Mr. Horowitz was assisting him in this matter, defendants filed a letter to Judge Matsumoto informing her of their intention to file a motion to disqualify Mr. Magnotti as counsel and direct Mr. Horowitz to cease his involvement in this case.

Court also grants defendants' motion to disqualify Mr. Magnotti. Plaintiffs are given 30 days to obtain new counsel. A status conference with this Court is scheduled for March 19, 2010 at 10:00 a.m.

**SO ORDERED.**

Dated: Brooklyn, New York
February 16, 2011

/s/ Cheryl Pollak
Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York