UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

THE GERFFERT COMPANY, INC. &
STEPHEN PANIGEL,

          Plaintiffs,

                                    **MEMORANDUM & ORDER**

        -against-                          09-CV-266 (PKC)

JAMES DEAN, *et al.*,

          Defendants.

-----------------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:



The Gerffert Company, Inc.'s catalogs[1]      William J. Hirten Co., LLC's catalogs

        The main question raised by Defendants' summary judgment motion is: were The

Gerffert Company, Inc.'s catalogs[2] for religious products, featuring the iconic artwork of Fratelli

---

[1]       To echo Judge Richard Posner on the Seventh Circuit: "In intellectual property cases, a picture, or, better, the very object claimed to infringe, is worth a thousand words of brief." *Publ'ns Int'l, Ltd. v. Landoll, Inc.*, 164 F.3d 337, 343 (7th Cir. 1998), *cert. denied*, 526 U.S. 1088 (1999).

[2]       (Dkt. Nos. 332-1–334 & 337-1–337-8 ("Defs.' Exs."), Ex. 4, at Ex. K ("Inspirational Wall Decor" catalog); Dkt. Nos. 335-3–335-67 ("Pls.' Exs."), Ex. L ("Frame/Magnet & Key

Bonella,[3] protectable trade dress infringed upon by William J. Hirten Co., LLC's catalogs[4] for the same product line?  Because the Court answers this question in the negative, it grants summary judgment in favor of Defendants on Plaintiffs' federal Lanham Act claim, and declines to exercise supplemental jurisdiction over their state-law claims.[5]

I. Background[6]

A. *The Facts*[7]

Plaintiff The Gerffert Company, Inc. ("Gerffert"), during the time period relevant to this lawsuit, was a New York distributor of Catholic-themed religious products, including prayer

---

[3]      Fratelli Bonella was originally formed as a partnership, but later became the Italian equivalent of a limited liability company, or an "s.r.l.," which stands for "società a responsabilità limitata."  For purposes of this decision, Fratelli Bonella's corporate form is irrelevant.

Chain" catalog); Pls.' Ex. O ("Micro-Perforated Prayer Cards" catalog); Pls.' Ex. EE ("Everlasting Laminated Holy Cards" catalog).)

[4]      (Pls.' Ex. BB ("Everlasting Laminated Holy Cards" catalog); Pls.' Ex. CC ("Micro Perforated Prayer Cards" and other "Holy Cards" catalog); Pls.' Ex. DD ("Catholic Art Creations" catalog); Pls.' Ex. FF ("Full Line" catalog).)

[5]      Because the Court has already dismissed certain of Plaintiffs' claims (Counts 1-9) for lack of subject matter jurisdiction (Dkt. No. 350), it only addresses their remaining claims (Counts 10-16) and the facts relevant for deciding these claims.

[6]      Citations to "ECF" reference the pagination of the Court's Electronic Court Filing system, and not the particular document's internal pagination.

[7]      The Court construes any disputed facts in the light most favorable to Plaintiffs, as the non-moving parties, for purposes of Defendants' summary judgment motion.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970) (Harlan, J.).  However, where Plaintiffs either (i) admit or (ii) deny without citing to admissible evidence certain of the facts asserted in Defendants' Local Rule 56.1 Statement (Dkt. No. 344 ("Defs.' 56.1")), the Court may deem any such facts undisputed.  *See* Local Rules of the United States District Courts for the Southern and Eastern Districts of New York 56.1(c)-(d); *see also Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (Sotomayor, J.) ("Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (collecting cases).  Standalone citations to "Defs.' 56.1" denote that the Court has deemed certain of Defendants' asserted facts undisputed and also incorporate by reference any documents cited therein.  Where relevant, however, the Court may cite directly to such documents.

cards and framed prints. (Dkt. No. 335-1 ("Panigel Decl.") ¶ 3.) As of 1984, Gerffert's owner and president was Plaintiff Stephen Panigel ("Panigel"). (*Id.* ¶¶ 3, 11.) Defendant James Dean ("Dean") was first employed by Gerffert, from 1988 to 2005, as an independent sales representative[8] and then, beginning in 2005, as an actual employee. (Defs.' 56.1 ¶ 64.) Defendant Fratelli Bonella ("Bonella"), an Italian company, produces religious artwork. (*Id.* ¶ 1.) Since 2005, Bonella's owners have been Defendant Andrea Bonella ("Andrea") and three other members of the Bonella family. (*Id.*)

For approximately five decades, between the late 1950s and May 2007, Gerffert served as the sole distributor of Bonella artwork in the United States.[9] (*Id.* ¶ 2.) In particular, Gerffert developed and sold products that incorporated Bonella artwork ("Bonella-related products"). (*Id.* ¶ 70; Panigel Decl. ¶¶ 25-27.) According to Panigel, Gerffert also devised a "unique numbering system" for Bonella-related products, consisting of (i) a "series" identifier for the type of product (*e.g.*, "81" for prints in 10-inch by 12-inch walnut frames; "800" for English-language laminated holy cards; "M" for non-gold micro-perforated prayer cards; "FM" for magnetic framed prints; "KC" for key chains) followed by (ii) a three-digit "image" number for the Bonella artwork.[10] (Panigel Decl. ¶¶ 3, 29, 32, 34, 40, 43, 45, 47-48.)

---

[8]     Gerffert sold its products through independent sales representatives, who also worked for a number of other companies. (Defs.' 56.1 ¶ 65.)

[9]     The dispute over whether this exclusive distribution arrangement was legally-enforceable, and/or in writing (Defs.' 56.1 ¶¶ 3, 112), is the subject of the claims that the Court has already dismissed. (Dkt. No. 350.)

[10]     Andrea, however, claims that Bonella, not Gerffert, created this numbering system. To support his claim, Andrea points out that Bonella uses the same series identifiers and image numbers as Gerffert for the sale of Bonella-related products in "other countries, including Japan, South Africa, New Zealand, Argentina and Australia." (Defs.' Ex. 1 ¶¶ 6, 8, 14, 17.) But, as Panigel argues, there is no evidence to establish that the products associated with particular series identifiers and image numbers *outside* of the United States are the same as the products associated with those identifiers and numbers *in* the United States. (Panigel Decl. ¶¶ 36-37, 49.)

In terms of Gerffert's marketing, Plaintiffs allege, but do not provide any evidence to establish, that Gerffert, in general, spent "in the millions of dollars" on "publicity and promotion of [its] products and services."  (Dkt. No. 1 ("Compl.") ¶¶ 112, 115.)  Plaintiffs further allege that such marketing entailed "the use of catalogs, membership in trade groups and appearances at annual trade shows and conventions" by Gerffert, without indicating what portion of its advertising expenditures went toward catalogs for Bonella-related products.[11]  (*Id.* ¶ 114.)

Gerffert incorporated certain basic elements consistently throughout its catalogs for Bonella-related products:  a decorative cover; general descriptions of the products in the series, including their dimensions and composition, atop every page; individual photographs for the products, arranged in rows on a solid background; and a series identifier and image number below each photograph.  (*See* Defs.' Ex. 4, at Ex. K; Pls.' Ex. L; Pls.' Ex. O; Pls.' Ex. EE.)

---

Andrea also points out that Bonella had U.S. copyrights on the series identifiers and image numbers, and a catalog containing those identifiers and numbers, for some of the Bonella-related products that Gerffert sold.  (Defs.' Ex. 1 ¶¶ 11-12.)  At best, Andrea suggests that Bonella created the image numbers, not the series identifiers, for certain products.  For instance, Bonella had a registered copyright for the image called the "Immaculate heart of Mary. No. 101-12," which Gerffert sold in the form of a micro-perforated prayer card as "M-101-12." (Defs.' Ex. 1, at Ex. C, at ECF 42; Pls.' Ex. O, at 18.)  Bonella also had a registered copyright for a catalog that contained the "Alba 01" image of Jesus, which Gerffert sold as "M-ALBA-01." (Defs.' Ex. 1, at Ex. D, at ECF 81; Pls.' Ex. O, at 21.)

Because the factual issue regarding the creation of this numbering system ultimately remains in dispute, the Court will construe it in the light most favorable to Plaintiffs, and assume that Gerffert devised the system.  *See Adickes*, 398 U.S. at 157-59 (holding that disputed evidence "must be viewed in the light most favorable to the opposing party" on summary judgment).

[11]  With respect to Bonella-related products, Panigel merely states that Gerffert bought "1,000 floor stands and a similar amount of counter-top displays" to market its laminated holy cards featuring Bonella artwork.  (Panigel Decl. ¶ 38.)  Panigel also stated, in a November 2008 e-mail to Dean, that Gerffert spent a "great deal of money" inputting the series identifiers and image numbers for Bonella-related products into its customers' "computer systems." (Defs.' Ex. 4, at Ex. J.)  None of these statements give any indication of Gerffert's expenditures on the subject trade dress in this case, namely, its catalogs.

But, in other ways, these catalogs also varied widely in their designs.  First, one of these catalogs had a cover that bore the Gerffert and Bonella logos, reproduced below, and the Bonella slogan ("The World's Very Best") (Pls.' Ex. EE); another only bore on its cover the Bonella logo and slogan, with no reference to Gerffert (Pls.' Ex. O); a different one had a cover that only bore the Gerffert logo, but referenced "The Bonella Line" (Defs.' Ex. 4, at Ex. K); and a fourth had a cover that only bore the Gerffert logo, with no reference to Bonella (Pls.' Ex. L).



Second, two catalogs had copyright stamps for Bonella, not Gerffert, at the bottom of every page (Pls.' Ex. O; Pls.' Ex. EE); another had a disclaimer of copyrights belonging to Bonella and Gerffert beneath the table of contents (Defs.' Ex. 4, at Ex. K); and one attributed no copyrights to Bonella whatsoever (Pls.' Ex. L).

There is no evidence of Gerffert's success in generating sales from Bonella-related products, except for Panigel's inapposite statement that its sales from *all* product lines "eventually reach[ed] over $5,000,000.00 annually."  (Panigel Decl. ¶ 50.)  The evidence, in fact, belies such success.  Starting in and around 2000, although Gerffert continued to send out its catalogs for Bonella-related products to customers,[12] Gerffert's sales of these products declined. For instance:

---

[12]     Gerffert's "Inspirational Wall Decor" catalog seems to be the only one of its catalogs, provided to the Court, which Gerffert published before 2000.  (*See* Defs.' Ex. 4, at Ex. K (1996); *see also* Pls.' Ex. G (1986).)  The other catalogs seem to have post-dated the sales decline, in and around 2000.  (*See* Pls.' Ex. L (2006); Pls.' Ex. O (2006); Pls.' Ex. EE (2000).)

- Panigel acknowledges that there was growing concern among the Bonella family about Gerffert's "*falling* sales" of Bonella-related products, beginning in "about January 2000." (*Id.* ¶ 52 (emphasis added); *see also* Compl. ¶ 27 (same).)

- In July 2004, the Bonella family stated, in a letter to Panigel, that "the survival of Fratelli Bonella itself is in danger," citing the fact that "the business is not increasing but *strongly decreasing*" and that, since 1995, Bonella had "lost 70% of [its] profitability in [the] USA." (Pls.' Ex. Q (emphasis added).) According to this letter, with annual sales of $1.2 million in 2003, Gerffert's line of Bonella-related products failed to generate any profit; and, with annual sales of $876,000 in 2002 and projected annual sales of $900,000 in 2004, respectively, the product line actually lost money. (*Id.*)

- In an e-mail later that month, the Bonella family stated that "the time of the big monthly orders [of Bonella-related products] is over" and that they, along with Gerffert, needed a "way to substitute the *decrease* in our traditional products." (Pls.' Ex. S (emphasis added).)

- In May 2007, Panigel e-mailed the Bonella family, stating that he had endeavored to "salvage the situation" with respect to "sales of the Bonella line" which needed to be improved. (Compl., at Ex. C, at ECF 52.)

In August 2007, against this backdrop of declining, and increasingly unprofitable, sales in Bonella-related products by Gerffert, a new company, William J. Hirten Company, LLC ("New Hirten"), was created by Andrea, Dean, and Defendant Dolores King ("King").[13] (Defs.' 56.1 ¶ 42; Defs.' Ex. R1-15 ¶ 18.) According to Panigel, New Hirten began selling, and immediately replaced Gerffert as the sole distributor of, these products.[14] (*See* Panigel Decl. ¶ 76 (stating that, although Bonella "used New Hirten as its exclusive distributor in the United States" *as of August 2007*, Gerffert remained a "valid, existing entity ready, willing, and able to distribute

---

[13]     King previously owned William J. Hirten Company, Inc., a New York distributor of other Catholic-themed religious products, including communion items and prayer books. (Defs.' 56.1 ¶ 8; Panigel Decl. ¶ 54; *see also* Compl. ¶ 31 (same).) The dispute over whether Andrea and Dean improperly terminated any other negotiations with Gerffert, and created New Hirten with King instead (Defs.' 56.1 ¶¶ 30-31, 33, 108-109), is also the subject of the claims that the Court has already dismissed. (Dkt. No. 350.)

[14]     Defendants, however, suggest that, in the "late summer of 2007," Gerffert *chose* to "stop[] submitting purchase orders [for Bonella artwork]" and "instructed Bonella to hold off on shipping previously placed orders." (Defs.' 56.1 ¶ 41.)

Fratelli Bonella artwork").)  Indeed, in November 2007, Panigel formally instructed Bonella to bill and ship any future orders of Bonella artwork to New Hirten, instead of Gerffert.  (Defs.' 56.1 ¶¶ 50-51.)

Like Gerffert, New Hirten catered to institutional customers, *i.e.*, other religious product companies, and not individual customers.  (*Id.* ¶ 96.)  Panigel states, without any evidence to support the statement, that, from the perspective of former Gerffert customers, "placing an order for [a Bonella-related] product from New Hirten was the same as placing an order with Gerffert," implying that customers invariably confused the two companies.  (Panigel Decl. ¶ 48.)  On the contrary, in November 2007, Panigel confessed that certain Gerffert customers had asked him whether, after "many years of buying from Gerffert," they should now buy Bonella-related products from the "*new* company," *i.e.*, New Hirten, and that he specifically assured them "it was O.K."  (Defs.' Ex. 1, at Ex. I (emphasis added); *see also* Defs.' Ex. 4 ¶ 40 ("During Gerffert's winding up process, Gerffert employees also directed customers to New Hirten if Gerffert was out of stock of a particular Bonella item.").)  Moreover, in January 2008, New Hirten sent a letter to *all* potential customers, identifying itself as the "*new* distributor of the Bonella line" and indicating that "much of the stock available to you now was out of stock by the *previous* distributor," *i.e.*, Gerffert.  (Defs.' Ex. 4, at Ex. E (emphasis added); *see also* Defs.' 56.1 ¶ 92 (same).)

After its January 2008 letter, New Hirten began sending out catalogs for Bonella-related products to potential customers.  (Defs.' 56.1 ¶ 93.)  New Hirten's catalogs not only contained similar, if not the same, products as Gerffert's catalogs, but also a nearly-identical spread of

product descriptions, photographs,[15] and series identifiers and image numbers.[16]  (Panigel Decl. ¶¶ 79-84; *see* Pls.' Ex. BB; Pls.' Ex. CC; Pls.' Ex. DD; Pls.' Ex. FF.)  As an example, the laminated holy cards catalogs for New Hirten and Gerffert, reproduced at the beginning of this decision, both have:

- a cover which bears the Bonella logo and colorful photographs of holy cards featuring Bonella artwork;

- a table of contents listing three series of holy cards with similar bulleted text (*e.g.*, "*800 Series* – English Text"; "*700 Series* – Spanish Text"; "Overall Size – 2½' x 4½'"; "All Laminated Cards Are Packed 25 Per Poly Bag"; "*All of the above Series are not available as paper prayer cards*") and a photograph next to each series; and

- product pages with (i) the same descriptions at the top (*i.e.*, "Everlasting Laminated Holy Cards"; "Crystal Clear"; "Hard Lamination"; "2½' x 4½'"; "With Prayers In Full Color"), (ii) nearly-identical photographs of the fronts and backs of every holy card in each series and their series identifiers and image numbers, arranged in three-by-four rows on a blue background, and (iii) copyright stamps for Bonella.

(*Compare* Pls.' Ex. BB, *with* Pls.' Ex. EE.)

In November 2008, having requested and received copies of New Hirten's catalogs throughout the year, Panigel e-mailed Dean, in his capacity as an owner of New Hirten, to complain about the catalogs (Defs.' 56.1 ¶¶ 99-100):

> I received Hirten's new Wall Décor catalog that you sent me in the mail the other day, and I must say, I am appalled and disappointed at what I saw in it.  *You, Andrea and Dolores have copied, wholesale, much of Gerffert's Wall Décor line.*  Who gave

---

[15]     Some photographs came from Starr Digital Photo, Inc. ("Starr"), which helped to design, and previously took the photographs of Bonella-related products for, certain of Gerffert's catalogs.  (Defs.' 56.1 ¶¶ 88-89.)  According to the owner and president of Starr, Gerffert only purchased the "non-exclusive right to use" these photographs in its catalogs.  (Defs.' Ex. 14 ¶ 4.)  In Fall 2007, New Hirten bought these photographs from Starr, and also retained Starr to design, and shoot other photographs of Bonella-related products for, New Hirten's catalogs.  (Defs.' 56.1 ¶¶ 89-90.)

[16]     Indeed, Defendants do not dispute that New Hirten's catalogs contained the "same or similar" Bonella-related products identified by the "same series and item numbers."  (Defs.' 56.1 ¶¶ 97-98.)

you permission to use Gerffert's proprietary item numbers, Gerffert's proprietary series numbers, [and] Gerffert's page headers?

\*      \*      \*

The Wall Décor catalog is not the first example of Hirten hijacking Gerffert's proprietary line. *In Hirten's laminated holy card catalog as well as its micro-perf catalog, you, Andrea and Dolores have done the same thing.*

(Defs.' Ex. 4, at Ex. J (emphasis added).)

As of 2013, Gerffert was no longer in business. (Panigel Decl. ¶ 105.) Indeed, pursuant to an asset purchase agreement with a third-party company, Gerffert agreed that it would stop using its name for the sale of any products in the United States. (Defs.' 56.1 ¶ 130.) Panigel states that Andrea, Dean, and King, through their ownership of New Hirten, were the "sole reason Gerffert is out of business," and that these three individuals are now "operating New Hirten on the back of Gerffert." (Panigel Decl. ¶ 106.)

### B. Procedural History

In January 2009, Plaintiffs filed the Complaint. The Complaint asserts "Diversity of Citizenship Claims" (Counts 1-9). (Compl., at 5.) As stated *supra* at note 5, the Court recently dismissed these claims for lack of subject matter jurisdiction, *without* prejudice to be re-filed in state court. (Dkt. No. 350.)

The Complaint also asserts "Claims Arising Under 15 U.S.C. § 1121, *et seq* [*i.e.*, the federal Lanham Act] and Pendent State Claims" (Counts 10-16). (Compl., at 26.) Plaintiffs characterize their federal Lanham Act claim (Count 10) as a "trade dress" claim pursuant to 15 U.S.C. § 1125(a), based on the allegation that New Hirten "divert[ed]" Gerffert customers by sending them catalogs that used the "proprietary stock numbers, item numbers, photography, header language or page layouts" that Gerffert's catalogs used for the "same" Bonella-related products. (*Id.* ¶¶ 121-24, 140-43; Dkt. No. 336 ("Pls.' Br."), at 8-11.) Plaintiffs' related state-

law claims (Counts 11-16) involve allegations about the companies' catalogs, along with other allegations about New Hirten's improper use of Gerffert's customer lists and purportedly untrue statements by New Hirten to potential customers. (Compl. ¶¶ 144-84.)

After more than four years of discovery, Defendants filed this summary judgment motion, which was fully briefed on October 29, 2013. (Dkt. No. 331.) In opposing this motion, Plaintiffs also cross-moved pursuant to Federal Rule of Civil Procedure ("FRCP") 56(d) for a deferral of summary judgment to permit further discovery. (Pls.' Br., at 3-8.) Plaintiffs, however, do not argue for discovery with respect to their federal trade dress claim, but *only* with respect to certain of their related state-law claims. (*See id.* at 8 (opposing summary judgment, "[n]otwithstanding the paucity of documentary discovery conducted thus far," on Counts 10-12 and Count 15), 13 ("Additional discovery is needed to establish the motives for the defendants' conduct [with respect to Count 13].").)

II. Discussion

    A. *Legal Standard*

To obtain summary judgment in their favor on a "claim or defense" in this case, Defendants, as the moving parties, must establish that "there is no genuine dispute as to any material fact," and, thus, that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendants' ability to satisfy this standard as to any "essential element" of a claim, for which Plaintiffs would "bear the burden of proof at trial," "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (Rehnquist, J.).

The summary judgment standard places on Defendants the initial burden to show that the evidence does not give rise to a "genuine" dispute over the facts legally relevant to Plaintiffs'

claim,[17] or any element thereof—to wit, a dispute that would allow a "reasonable jury" to "return a verdict for" Plaintiffs.[18]  *Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 323.  There is "no express or implied requirement" that Defendants "negat[e] [Plaintiffs'] claim" with evidence of their own, as long as they "point[] out to the district court . . . that there is an absence of evidence to support [Plaintiffs'] case."  *Celotex*, 477 U.S. at 323, 325 (emphasis omitted); *see also Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006) (holding that one of the "two ways" for the defendants to establish their "prima facie entitlement" to summary judgment dismissing the plaintiff's claim is to "identify those portions of [the plaintiff's] evidence that demonstrate the absence of a genuine issue of material fact").

Once Defendants have met their burden under this standard, Plaintiffs must "do[] more than simply rely on the contrary allegation[s] in [their] complaint," and "go beyond the pleadings" to "designate specific facts showing that there *is* a genuine issue for trial."  *Adickes*, 398 U.S. at 160; *Celotex*, 477 U.S. at 324 (emphasis added; quotations omitted); *see also D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998) (holding that the plaintiff "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence" to defeat summary judgment dismissing his claims) (collecting cases), *cert. denied*, 524 U.S. 911 (1998).  That is, "a plaintiff opposing summary judgment may not rely on his complaint to defeat the motion."  *Champion v. Artuz*, 76 F.3d 483, 485 (2d Cir. 1996) (per curiam).

---

[17]    "Material" facts are legally-relevant ones, *i.e.*, facts that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (White, J.).

[18]    Disputes over facts that are "merely colorable" or "not significantly probative," or amount to a "scintilla . . . in support of [Plaintiffs'] position," are not "genuine."  *Anderson*, 477 U.S. at 249, 252.

*B. Federal Trade Dress Claim*

Defendants conclude that they are entitled to summary judgment on Plaintiffs' federal Lanham Act claim of trade dress infringement based on the catalogs for Bonella-related products. (Dkt. No. 330 ("Defs.' Br."), at 41-44; Dkt. No. 337 ("Defs.' Reply"), at 23-24.) Upon review of the available evidence and applicable law, the Court reaches the same conclusion, though, unlike Defendants who focus their analysis on the liability element of this claim ("likelihood of confusion"), the Court's analysis focuses on the protectability elements ("non-functionality" and "distinctiveness"). Because Gerffert's catalogs for Bonella-related products are not "inherently distinctive" and did not become distinctive by acquiring "secondary meaning," they are not protectable trade dress.

The Federal Lanham Act not only protects the trademarks for products, but also their trade dress. 15 U.S.C. § 1125(a) (providing a "civil action for trade dress infringement under this chapter");[19] *see also Wal-Mart Stores, Inc. v. Samara Bros., Inc.* ("*Samara Bros.*"), 529 U.S. 205, 209 (2000) (Scalia, J.) (indicating that 15 U.S.C. § 1125(a) "embrace[s] not just word marks, . . . but also 'trade dress'"). Trade dress includes the "design or packaging of a product." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001) (Kennedy, J.); *see also Samara Bros.,* 529 U.S. at 209-10 (same) (collecting cases). Catalogs, like packaging, can also dress products by promoting and displaying them for sale to potential customers. *See Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.* ("*Am. Eagle Outfitters*"), 280 F.3d 619, 630 (6th Cir. 2002) ("[T]rade dress has been held to include . . . the layout and appearance

---

[19]     The broad language of 15 U.S.C. § 1125(a) prohibits infringing uses of "any word, term, name, symbol, or device, or any combination thereof" that are "likely to cause confusion . . . as to the origin, sponsorship, or approval of [one's] goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1).

of a mail-order catalog[.]") (citing *Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc.*, 87 F.3d 654 (4th Cir. 1996)); *Hofmann v. Kleinhandler*, No. 93-CV-5638, 1994 WL 240335, at *4 (S.D.N.Y. May 31, 1994) (Leisure, J.) ("[C]ourts in this Circuit have held that brochures and catalogues can constitute trade dress.") (collecting cases).[20]  Like trademark protection, "protection for trade dress exists to promote competition." *TrafFix Devices*, 532 U.S. at 28.

To prevail on the federal trade dress claim, Plaintiffs must prove that their trade dress is (i) non-functional;[21] (ii) inherently distinctive or distinctive through its acquisition of secondary meaning; and (iii) likely to be confused with Defendants' allegedly infringing trade dress.  *See Samara Bros.*, 529 U.S. at 210-11 (holding that, for trade dress claims, 15 U.S.C. § 1125(a) requires a showing of non-functionality and likelihood of confusion, and that, although "[n]othing in [the statute] explicitly requires" a showing of distinctiveness, "courts have universally imposed that requirement").[22]  The non-functionality and distinctiveness elements

---

[20]      *See also SGC Commc'n Res., LLC v. Seminar Ctr., Inc.*, No. 98-CV-2724, 2001 WL 274053, at *6 (S.D.N.Y. Mar. 20, 2001) (addressing a trade dress claim based on the plaintiff's catalog); *cf. Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n.1 (1992) (White, J.) (noting that the "trade dress of a product," *i.e.*, its "total image," includes "particular sales techniques") (quotations omitted); *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 999 (2d Cir. 1997) (indicating that the "displays and other materials used in presenting the product to prospective purchasers" are also trade dress) (quoting Restatement (Third) of Unfair Competition § 16 cmt. a (1995)).

[21]      The non-functionality element is further explained *infra* at Section II.B.1.

[22]      Although courts have inconsistently set forth the ordering for the three elements of federal trade dress claims, the Court here adopts the above ordering for purposes of resolving Plaintiffs' claim on summary judgment, even though only the second element and not the first element is dispositive.  *Accord TrafFix Devices*, 532 U.S. at 33 ("Functionality having been established, whether [the subject trade dress] has acquired secondary meaning need not be considered."); *Samara Bros.*, 529 U.S. at 210 ("[W]ithout distinctiveness the trade dress would not cause confusion[.]") (quotations omitted).

relate to the protectability of Plaintiffs' trade dress,[23] whereas the likelihood of confusion element relates to whether Defendants are liable for copying it. *Two Pesos*, 505 U.S. at 769-70; *Am. Eagle Outfitters*, 280 F.3d at 629. As stated above, in the following analysis, the Court focuses on the protectability elements.

### 1. Non-Functionality[24]

Trade dress is non-functional if it is neither traditionally, nor esthetically, functional: (i) "traditional" functionality exists when any feature of a product is "essential to [the product's] use or purpose" or "affects [its] cost or quality"; and (ii) "esthetic" functionality exists when that feature is otherwise a "competitive necessity," *i.e.*, the absence of that feature would "put competitors at a significant non-reputation-related disadvantage." *TrafFix Devices*, 532 U.S. at 32-33 (quotations omitted). In this case, Plaintiffs' burden of proof at trial would be to establish that Gerffert's catalogs, as trade dress for Bonella-related products, do not satisfy *either* standard

---

[23] The protectability elements are designed to ensure that protection under federal law only extends to trade dress that "serves to identify the product[s] with [their] manufacturer or source." *TrafFix Devices*, 532 U.S. at 28. Together, courts and Congress have determined that purely functional and/or non-distinctive trade dress cannot serve a source-identifying purpose; thus, it is not essential to "preserv[ing] our competitive economy," and possibly detrimental to competition, to protect against the copying of such trade dress. *Id.* at 28-29; *see also Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 116 n.5 (2d Cir. 2001) ("Both principles [of non-functionality and distinctiveness] ensure that a trademark right does not unduly stifle competition."); *Fun-Damental Too*, 111 F.3d at 1002 ("If [trade dress] is functional, promotion of fair competition between producers demands that such trade dress be denied Lanham Act protection.").

[24] The non-functionality element overlaps with the distinctiveness element: trade dress which combines elements that make it functional, as a whole, "should be regarded as unprotectable or '*generic*.'" *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir. 1995) (emphasis added); *see also Yurman Design*, 262 F.3d at 116 n.5 ("The nonfunctionality requirement substantially overlaps with the prohibition on overbroad [*i.e.*, generic] marks discussed above."); *Publ'ns Int'l*, 164 F.3d at 340 ("[F]unctionality and distinctiveness are intertwined issues."); *Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.*, 40 F.3d 1431, 1442 (3d Cir. 1994) ("In trade dress law, the inquiry into functionality resembles the genericness inquiry in trademark law[.]").

of functionality. The Court finds that Plaintiffs could prove non-functionality at trial, and that there is at least a triable issue of fact with respect to this element.

In terms of traditional functionality, it is in no way clear, and indeed Defendants fail to argue, that Gerffert's catalogs shaped the "use or purpose" or "cost or quality" of Bonella-related products. *Id.*; *see Scan-Plast Indus., Inc. v. Scanimport Am. Inc.*, 652 F. Supp. 1156, 1162-63 (E.D.N.Y. 1987) (McLaughlin, J., adopting Report-Recommendation of Amon, Mag. J.) (finding that "there is a genuine issue of fact as to whether copied features of plaintiffs' brochures, e.g., the color coding and numbering systems, are non-functional" and that "the defendant does not argue that these features are essential to the use of the product or impact upon the quality or cost of the product"); (Defs.' Br., at 42 (arguing only that the "catalog elements" are functional, "since they are necessary for customers to identify the product to place an order," *i.e.*, a competitive necessity).[25] The potential argument, if one were made, that these catalogs allowed Gerffert to charge more for, and improved the perceived value of, such products is tenuous. Therefore, there is sufficient evidence upon which a jury could find that Gerffert's catalogs are not "traditionally" functional and, thus, potentially protectable.

Whether a jury could find that Gerffert's catalogs are not "esthetically" functional is a closer call. On the one hand, Gerffert's catalogs primarily contained design elements that are competitively necessary, at least in the abstract, *e.g.*, Bonella-related product descriptions, numbering, and photographs. The inability of rival companies to describe, designate, or display images of their products would impose on them a "significant non-reputation-related

---

[25]    *See also Am. Eagle Outfitters*, 280 F.3d at 641 (finding a triable issue as to whether the "design of the catalog," as a "device for selling clothing," was "functional in the traditional sense").

disadvantage." *TrafFix Devices*, 532 U.S. at 32-33 (quotations omitted).[26] On the other hand, the *specific* descriptions, numbering, and photographs of such products by Gerffert are not competitive necessities. *See Scan-Plast Indus.*, 652 F. Supp. at 1163 (finding that, because of the "other combinations [of colors and numbers] defendants could have used [to identify the product parts]" in their brochures, "[the defendant's] ability to compete would not be hindered by extending protection to these features [in the plaintiffs' brochures]").[27] Nor is Gerffert's *particular* arrangement of these elements on the catalog pages, *e.g.*, rows and solid backgrounds, which can best be described as an ascetic design, a competitive necessity. *See Am. Eagle Outfitters*, 280 F.3d at 644 (collecting cases).[28]

Accordingly, there is an issue for trial with respect to the non-functionality element, because, on balance, a reasonable jury could find that Gerffert's catalogs are not traditionally or esthetically functional.

---

[26] *Cf. Chelo Publ'g Inc. v. Focus Publ'g Ltd.*, No. 94-CV-123, 1994 WL 391668, at *3 (S.D.N.Y. July 28, 1994) (finding that the general inclusion of magazine titles and article names on the covers of magazines are "functional features necessary to attract the fleeting attention of consumers from among many competing products at the newsstand point of sale").

[27] *See also Tools USA*, 87 F.3d at 659 (finding that certain information "might be useful," but the "exact wording" used to convey that information is not necessary); *cf. Ideal Toy Corp. v. Chinese Arts & Crafts Inc.*, 530 F. Supp. 375, 378 (S.D.N.Y. 1981) (finding that the use of "solid colors" on a Rubik's Cube could be an "advantageous way to display the product to consumers," but there are "other functional ways to package or display the product, or to dress the cube").

[28] *See also Tools USA*, 87 F.3d at 659 ("[W]hile this *information* may be functional, its placement . . . is not.") (emphasis in the original); *Dana Braun, Inc. v. SML Sport Ltd.*, No. 03-CV-6405, 2003 WL 22832265, at *12 (S.D.N.Y. Nov. 25, 2003) ("Although several of these elements of [the plaintiff's catalog], in and of themselves, are not distinctive and could be construed as functional, the entire presentation . . . is distinctive."); *cf. Publ'ns Int'l*, 164 F.3d at 342 ("Although none of the functional features of [the plaintiff's] cookbooks can be appropriated to serve as a trade dress, it doesn't follow that the ensemble cannot be.").

## 2. Distinctiveness

The distinctiveness of trade dress is assessed based on the same four classifications that Judge Henry Friendly on the Second Circuit articulated for trademark claims in *Abercrombie & Fitch Company v. Hunting World, Incorporated* ("*Abercrombie*"), 537 F.2d 4 (2d Cir. 1976): (i) generic, (ii) descriptive, (iii) suggestive, and (iv) arbitrary or fanciful. *See Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577, 583 (2d Cir. 1993) (holding that "the *Abercrombie* classifications apply to trade dress").[29] "Arbitrary or fanciful" and "suggestive" trade dress is "inherently distinctive"; "descriptive" trade dress is distinctive *only* if it acquires "secondary meaning"; and "generic" trade dress is *never* distinctive. *Paddington*, 996 F.2d at 583; *cf. Two Pesos*, 505 U.S. at 776 ("[P]roof of secondary meaning is not required to prevail on a claim under § 43(a) of the Lanham Act where the trade dress at issue is inherently distinctive[.]"). In other words, Plaintiffs here would have the burden of proving at trial that Gerffert's catalogs for Bonella-related products are inherently distinctive, *i.e.*, arbitrary/fanciful or suggestive; *or* that these catalogs are descriptive and became distinctive through their acquisition of secondary meaning. The Court finds that Plaintiffs can prove to a jury that these catalogs are descriptive at best, but that no jury could conclude that they acquired secondary meaning.

### i. Inherently or Non-Inherently Distinctive

The first issue is whether Gerffert's catalogs fall into one of the inherently distinctive classifications (arbitrary/fanciful or suggestive) or non-inherently distinctive classifications (descriptive or generic). The arbitrary/fanciful classification extends to trade dress "applied in an

---

[29] *See also Fun-Damental Too*, 111 F.3d at 999-1000 (same). The only exception is that Judge Friendly's *Abercrombie* classifications do not extend to product-design trade dress claims, which Plaintiffs' claim is not. *Id.* at 1000 (distinguishing *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996 (2d Cir. 1995), as a "product configuration case, separate from product packaging, the category of trade dress at issue in this case").

unfamiliar way," or "invented solely," to designate specific goods. *Abercrombie*, 537 F.2d at 11 n.12. The suggestive classification extends to trade dress that "requires imagination, thought and perception to reach a conclusion as to the nature of [the] goods." *Id.* at 11. The descriptive classification extends to trade dress that "forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *Id.* Finally, the generic classification extends to trade dress that simply "refers . . . to the genus of which the [goods] [are] a species." *Id.* at 9.

Although the Second Circuit in *Mana Products, Inc. v. Columbia Cosmetics Mfg., Inc.*, 65 F.3d 1063 (2d Cir. 1995),[30] explained that granting a defendant's summary judgment motion on the basis of non-inherent distinctiveness is "not generally favored," it ultimately held that, "when the possibilities of the ultimate trade dress for a product are limited," a finding on that basis is appropriate. *Id.* at 1069-70.[31] In *Mana Products*, the Second Circuit rejected the claim that the plaintiff's makeup compacts, "with their rectangular and square designs," were inherently distinctive trade dress for its cosmetic products, because "the compacts' size and shape" were "common characteristics of the entire genre of makeup compacts." *Id.* at 1070. Therefore, the makeup compacts in *Mana Products* were, "at best, descriptive," but "not inherently distinctive." *Id.*

The Court reaches the same conclusion in this case. Gerffert's particular use of catalogs is not an "unfamiliar" method, or something newly "invented," solely for marketing its Bonella-

---

[30]     In their opposition (Pls.' Br., at 9), Plaintiffs quote *Ivy Mar Co., Inc. v. C.R. Seasons Ltd.*, No. 95-CV-508, 1998 WL 704112, at *5 (E.D.N.Y. Oct. 7, 1998), which, in turn, quotes *Mana Products* for this proposition.

[31]     In *Publications International*, Judge Posner added that "distinctiveness is *not* really an issue of fact," but is "classified with issues of fact for purposes of drawing the line between the jury's authority and that of the judge and the reviewing court." 164 F.3d at 340 (emphasis added). Judge Posner noted that a "grant of summary judgment" on the basis of non-distinctiveness is proper, "if no reasonable trier of fact could conclude otherwise." *Id.*

related products. *Abercrombie*, 537 F.2d at 11 n.12. Indeed, as compared to the "endless options" for packaging a company's products, there are "common" constraints on the ways that a company like Gerffert can present its products through catalogs, *i.e.*, catalogs are formatted as books and their pages contain basic product information. *Mana Prods.*, 65 F.3d at 1069-70; *cf. Publ'ns Int'l*, 164 F.3d at 343 (noting that "book genres" contain various "look-alikes that do not, however, confuse consumers about the identity of the publisher of any particular book"). Nor do Gerffert's catalogs demand any sort of "imagination, thought and perception" to discern what they are actually selling, *i.e.*, Bonella-related products. *Abercrombie*, 537 F.2d at 11. On the contrary, the primary aim of these catalogs is to *inform* potential customers of the Bonella-related products available for purchase through Gerffert. In short, there is nothing to suggest that these catalogs are *so distinctive* that they are inherently "capable of identifying a particular source of the product." *Two Pesos*, 505 U.S. at 771.

At the same time, Gerffert's catalogs are *not so "commonplace"* that their appearance simply "refers . . . to the genus" of Bonella-related products. *Mana Prods.*, 65 F.3d at 1070 (emphasis added); *Abercrombie*, 537 F.2d at 9. That is, these catalogs are bound to look similar, but not necessarily identical, to catalogs for Bonella-related products sold by other companies. *See Regal Jewelry Co., Inc. v. Kingsbridge Int'l, Inc.*, 999 F. Supp. 477, 489-90 (S.D.N.Y. 1998) (finding that the plaintiff's "box designs" to package its novelty items were descriptive, and not generic, because they were "similar to those of the other manufacturers" but not the "singular custom in the industry").

On balance, the four corners of Gerffert's catalogs, as they should, "forthwith convey[] an immediate idea" about the Bonella-related products for sale and are, thus, descriptive in nature. *Abercrombie*, 537 F.2d at 11; (*see* Defs.' Br., at 41 (conceding that Gerffert's catalogs

are "descriptive at best")).  Other courts have *implicitly* affirmed this conclusion by assessing the secondary meaning of catalogs, which is only a requirement for *descriptive* trade dress claims. *See Am. Eagle Outfitters*, 280 F.3d at 639 (holding that "[the plaintiff] can meet the distinctiveness requirement by showing attachment of secondary meaning to its designs," including that of a mail-order clothing catalog).[32]

Judge Posner's opinion in *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604 (7th Cir. 1986), is also instructive.  There, the Seventh Circuit held that the plaintiff's advertisement, containing a "schematic, graphic, or metaphoric representation" of the areas which it serviced, was "descriptive" trade dress, akin to a "source of information [to potential customers] about [its] service areas" and *not* a "symbol or mnemonic designed to fix [the plaintiff] or its service in the reader's mind."  *Id.* at 609-10.  By analogy, Gerffert's catalogs in this case are collections of representations—graphic, numeric, or otherwise—which informed potential customers about the Bonella-related products that it was offering to sell them.  Such informative, and not symbolic, representations about a company's products and services are nothing more than descriptive trade dress.

---

[32]     *See also Tools USA*, 87 F.3d at 657, 659-60 (noting the jury's finding that the plaintiff's catalog was "not inherently distinctive," and only considering on appeal whether the jury should have found that the catalog had "secondary meaning"); *Dana Braun*, 2003 WL 22832265, at *12 (considering whether "plaintiff's catalog has acquired secondary meaning"); *Crown Awards, Inc. v. Trophy Depot*, No. 03-CV-2448, 2003 WL 22208409, at *18-19 (E.D.N.Y. Sept. 3, 2003) (finding no evidence that the plaintiff's "catalogues, website and advertisements" had "acquired secondary meaning"); *Rosco, Inc. v. Mirror Lite Co.*, 139 F. Supp. 2d 287, 297-99 (E.D.N.Y. 2001) (analyzing the "secondary meaning" of the plaintiff's "product numbering system," which the defendant used "in a catalogue," with respect to a false designation of origin claim under 15 U.S.C. § 1125(a)), *rev'd on other grounds*, 304 F.3d 1373 (Fed. Cir. 2002); *but see SGC Commc'n Res.*, 2001 WL 274053, at *6-8 (declining to find, "as a matter of law," whether the plaintiff's catalog is "arbitrary and fanciful" or "generic," but *still* considering the issue of "secondary meaning"); *Ivy Mar*, 1998 WL 704112, at *5-6 (same).

Accordingly, there is *no* issue for trial with respect to the non-inherently distinctive classification of Gerffert's catalogs. These catalogs are descriptive at best and, thus, require the acquisition of secondary meaning to be deemed protectable.

ii.   Secondary Meaning

The second issue is whether Gerffert's catalogs, as descriptive trade dress, somehow acquired secondary meaning. Secondary meaning requires that, "in the minds of the public," the "primary significance of a product feature," such as its trade dress, is "to identify the *source* of the product rather than the product itself." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982) (O'Connor, J.) (emphasis added). To evaluate the secondary meaning of trade dress, the Court must consider the following six factors: "(1) advertising expenditures, (2) consumer studies linking [the trade dress] to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize [the trade dress], and (6) length and exclusivity of [the trade dress's] use." *Mana Prods.*, 65 F.3d at 1071 (quoting *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1222 (2d Cir. 1987)).

Plaintiffs, in this case, have neither alleged, nor cited any evidence of, "consumer studies" equating Gerffert with its catalogs for Bonella-related products, "unsolicited media coverage" of these products, *or* other "attempts to plagiarize" these catalogs, apart from Defendants' attempts with New Hirten's catalogs. *Id.* Meanwhile, the "sales success" factor, at a minimum, does not support the presence of secondary meaning, and, if anything, is indicative of the *absence* of such meaning. *Id.* The sales that Gerffert generated from Bonella-related products declined, and became unprofitable, despite the company's publication of catalogs for these products. *See supra* Section I.A.

In terms of "advertising expenditures," Plaintiffs' mere allegation in the Complaint that Gerffert spent "millions of dollars" on advertising may not properly defeat summary judgment.

21

*Mana Prods.*, 65 F.3d at 1071; *see Adickes*, 398 U.S. at 160 (requiring the non-moving parties on summary judgment to "do[] more than simply rely on the contrary allegation[s] in [their] complaint"); *Celotex*, 477 U.S. at 324 (same); *supra* Section I.A.  Furthermore, Plaintiffs fail to specify how much was spent by Gerffert on its catalogs.  *Cf. Urban Grp. Exercise Consultants, Ltd. v. Dick's Sporting Goods, Inc.*, No. 12-CV-3599, 2013 WL 866867, at *3 (S.D.N.Y. Mar. 8, 2013) ("[T]here is no contention that any of those advertisements or promotions stressed or emphasized the alleged trade dress.") (collecting cases).

The only factor which remotely supports the finding that Gerffert's catalogs acquired secondary meaning is the "length and exclusivity" with respect to its use of these catalogs.  *Mana Prods.*, 65 F.3d at 1071.  Gerffert sold Bonella-related products on an exclusive basis for close to five decades, though the available evidence only suggests that the company published or distributed catalogs for these products in the last two decades, between 1986 and 2007.  *See supra* Section I.A & note 12.

However, certain inconsistences in Gerffert's catalogs throughout that period undermine the existence of secondary meaning based on the "length and exclusivity" of their use.  *See Regal Jewelry*, 999 F. Supp. at 490 ("While [the plaintiff] had been using some form of its trade dress for five years at the time of the alleged infringement, [its] inconsistent use of its theme trade dress undermines this factor.").[33]  Indeed, certain of these catalogs displayed Bonella logos and/or copyright stamps, including one that made no mention of Gerffert whatsoever, whereas other catalogs did not.  *See supra* Section I.A.  Such inconsistences might have caused the

---

[33]     *See also Waddington N. Am. Bus. Trust v. EMI Plastics, Inc.*, No. 02-CV-3781, 2002 WL 2031372, at *5-6 (E.D.N.Y. Sept. 5, 2002) (finding no secondary meaning, because, although the plaintiff exclusively sold "for over 8 years" the products as to which it asserted a product-design trade dress claim,  "the designs are not used consistently to designate the source of the products") (quotations omitted).

"minds of the public" to associate these catalogs with Gerffert *or* Bonella, and not necessarily to attribute the "primary significance" of these catalogs to Gerffert as the sole "source" of Bonella-related products.  *Inwood Labs.*, 456 U.S. at 851 n.11.

In short, Plaintiffs may only point, tenuously at best, to *one* of the six factors in arguing that Gerffert's catalogs acquired secondary meaning.  While every factor "need not be proved," *Thompson Med. Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir. 1985), where "only one of the factors probative of secondary meaning" is proved, or only those factors not supported by customer-related "surveys, quantitative evidence or testimony" are proved, such proof cannot sustain a finding of secondary meaning.  *Mana Prods.*, 65 F.3d at 1071; *Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 826-27 (Fed. Cir. 1992).  As the First Circuit has further articulated:

> Proof of secondary meaning requires at least *some* evidence that consumers associate the trade dress with the source.  Although evidence of the pervasiveness of the trade dress may support the conclusion that a mark has acquired secondary meaning, *it cannot stand alone*.  To find otherwise would provide trade dress protection for any successful product, or for the packaging of any successful product.

*Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 44 (1st Cir. 2001) (first emphasis in the original; second emphasis added) (considering similar factors as the Second Circuit).

In *Mana Products*, the Second Circuit held that the plaintiff had not proven secondary meaning, because it only provided evidence of its multi-million dollar "advertising budget" and "failed to submit any consumer surveys, information as to the relative market share of its [products], unsolicited media coverage, or the amount of time that [the trade dress] made exclusive use of the challenged design."  65 F.3d at 1071.  Likewise, in *Braun*, the Federal Circuit, in applying the same factors as the Second Circuit, found that the jury's finding of secondary meaning was unsupported, in light of the plaintiff's "limited evidence as to advertising, sales and media attention, standing alone."  975 F.2d at 826.  In *Yankee Candle*, the

First Circuit similarly concluded that the plaintiff's "circumstantial evidence" of secondary meaning, *i.e.*, the length of trade dress usage, advertising expenses, and sales success, did not suffice to overcome the lack of any evidence showing a "conscious connection by the public between the claimed trade dress and the product's source." 259 F.3d at 44-45.[34]

Plaintiffs rely on *Ivy Mar* in arguing that a jury could find that Gerffert's catalogs had secondary meaning. (*See* Pls.' Br., at 10.) Such reliance is misplaced. In that case, the district court found a triable issue of secondary meaning, in light of the plaintiffs' direct "evidence indicating that their customers relied upon the stock numbers and the layout of the merchandise in the catalogs as a means of identifying [the plaintiffs] as the source of the merchandise." *Ivy Mar*, 1998 WL 704112, at *6; *see also id.* at *2 (citing "documents" from one of the plaintiffs' customers).[35] Moreover, the district court's analysis neither mentioned, nor discussed, the secondary meaning factors in support of its finding. *Id.* at *6.

Here, the only evidence that Plaintiffs have presented with respect to any relevant factor, *i.e.*, the "length and exclusivity" of Gerffert's catalog usage, is insufficient to establish secondary meaning as a matter of law. Accordingly, there is *no* issue for trial with respect to whether Gerffert's catalogs, as descriptive trade dress, failed to acquire such meaning.

Because no reasonable jury could find that these catalogs were inherently distinctive *or* distinctive through their acquisition of secondary meaning, Plaintiffs' federal trade dress claim is dismissed *with* prejudice.

---

[34] *See also Rosco*, 139 F. Supp. 2d at 297-98 (refusing to find that "[the plaintiff's] numbering system has obtained second-class meaning with consumers," where "[n]o evidence of advertising expenditures, consumer studies, or unsolicited media coverage was presented at trial").

[35] Similarly, the district court in *SGC Communication Resources* only decided against a grant of summary judgment on the secondary meaning issue, because the plaintiff put forth some evidence of *all* of the relevant factors except for "consumer surveys." 2001 WL 274053, at *7-8.

Having dismissed this claim on the basis of non-distinctiveness, the Court declines to consider the likelihood of confusion element.[36] *See Samara Bros.*, 529 U.S. at 210 ("[W]ithout distinctiveness the trade dress would not cause confusion[.]") (quotations omitted); *Thompson Med.*, 753 F.2d at 218-19 ("Only if the district court rules that [the trademark] has acquired secondary meaning must it comprehensively examine the *Polaroid* factors to determine whether there exists a likelihood of confusion as to source.").

### C. Related State-Law Claims

The Court "may decline to exercise supplemental jurisdiction" over Plaintiffs' related state-law claims, if, among other things, it has already "dismissed all claims over which it has original jurisdiction," *i.e.*, their federal Lanham Act claim of trade dress infringement. 28 U.S.C. § 1367(c)(3). In the "usual case in which all federal-law claims are eliminated before trial," the so-called *Gibbs* factors of "judicial economy, convenience, fairness, and comity," which the Court should also consider before declining to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c), will "point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill* ("*Cohill*"), 484 U.S. 343, 350 n.7 (1988) (Marshall, J.) (citing *United Mine Workers of Am. v. Gibbs* ("*Gibbs*"), 383 U.S. 715 (1966) (Brennan, J.)); *see also Gibbs*, 383 U.S. at 726 ("Certainly, if the federal claims are dismissed

---

[36]     Even if the Court were to consider the likelihood of confusion element, it would probably conclude that several of Judge Friendly's well-accepted *Polaroid* factors, designed to assess this element, disfavor Plaintiffs:  (i) Gerffert's catalogs have minimal "strength" as descriptive trade dress; (ii) Bonella-related products sold by Gerffert and New Hirten lacked temporal "proximity," because these products were never on the market at the same time; (iii) potential customers in the market for Bonella-related products were "sophisticat[ed]" institutions, not individuals; and (iv) there was no "actual confusion" between both sources of Bonella-related products, because potential customers were notified that New Hirten was a new company, not to be confused with Gerffert. *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961), *cert. denied*, 368 U.S. 820 (1961); *see supra* Section I.A.

before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

In *Blau Plumbing*, upon affirming the dismissal of the plaintiff's advertisement-based trade dress claim on summary judgment, Judge Posner concluded that the district court was "wrong to go on and decide the merits of [the plaintiff's] state law claim for false advertising." 781 F.2d at 611. "State law claims should not be retained for adjudication in federal court when the sole remaining basis for federal jurisdiction is the judge-made doctrine of pendent jurisdiction, unless there are pressing reasons for retention; none has been shown here." *Id.* at 612. This case is no different.

First, judicial resources are better conserved by dismissing the related state-law claims. These claims, which involve more than the allegations concerning Gerffert's and New Hirten's catalogs, would require "resolving additional issues of fact." *N.Y. Mercantile Exch., Inc. v. IntercontinentalExchange, Inc.*, 497 F.3d 109, 118-19 (2d Cir. 2007) (dismissing the plaintiff's state-law claims, after dismissing its "federal copyright claim"), *cert. denied*, 552 U.S. 1259 (2008). Furthermore, while discovery in this case has largely been completed over the last four years, Plaintiffs are seeking, in the context of their FRCP 56(d) cross-motion, *more* discovery relating to certain of these claims.[37] *See Valencia v. Lee*, 316 F.3d 299, 306 (2d Cir. 2003) ("Although most of the anticipated pretrial discovery had been completed, this was a relatively early stage of the case."); *supra* Section I.B.

Second, a dismissal *without* prejudice of the related state-law claims is still convenient for, and fair to, the parties. Because the Court previously dismissed *other* state-law claims for

---

[37] Because the Court dismisses *without* prejudice the related state-law claims, it need not address Plaintiffs' FRCP 56(d) cross-motion with respect to such claims (Pls.' Br., at 3-8).

lack of subject matter jurisdiction, the parties may now pursue all of these claims in a single case before the state court, *without* duplicating their discovery efforts. *See Tishman v. Associated Press*, No. 05-CV-4278, 2007 WL 4145556, at *9 (S.D.N.Y. Nov. 19, 2007) (holding that "plaintiffs will not be prejudiced by the dismissal of their [state and city law claims]," because (i) N.Y. C.P.L.R. 205(a) "allows a plaintiff to recommence a dismissed suit within six months without regard to the statute of limitations," and (ii) "it does not appear that any discovery would need to be repeated if plaintiffs' pendent claims were brought in state court") (quotations omitted).

Finally, the interest in comity with state courts is served as well. Resolving the related state-law claims, which involve factual issues separate from the federal trade dress claim, would result in a "[n]eedless decision[] of state law." *Gibbs*, 383 U.S. at 726. The more extensive scope of these claims also suggests that this case is an "effort to impose upon [the Court] what is in effect only a state law case," to which the federal claim is a mere "appendage." *Id.* at 727.[38]

This case, therefore, is the "usual" one in which the *Gibbs* factors "point toward" the Court's dismissal of the related state-law claims *without* prejudice, upon its dismissal of the federal trade dress claim *with* prejudice. *Cohill*, 484 U.S. at 350 & n.7.

III. Conclusion[39]

For the reasons set forth above, the Court (i) dismisses Plaintiffs' federal Lanham Act claim of trade dress infringement *with* prejudice and (ii) dismisses their related state-law claims

---

[38]     In this case, the Court may also, but need not, dismiss such claims on the basis that they "substantially predominate[]" over the federal trade dress claim. 28 U.S.C. § 1367(c)(2).

[39]     The Court also declines to address Defendants' collateral estoppel and *res judicata* defenses (Defs.' Br., at 6-15), which are moot in light of its decision.

*without* prejudice to be re-filed in state court. The Clerk of the Court is directed to enter judgment accordingly, and close this case.

SO ORDERED:


 /s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge


Dated: August 29, 2014
      Brooklyn, New York